UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW MEXICO

In re:
MICHAEL KEENAN and
RAMONA KEENAN,
Debtors.

No. 13-05-21229 SA

**MEMORANDUM OPINION ON CONFIRMATION,**
**MOTION TO AVOID LIEN, AND MOTION TO DISMISS**

This matter came on for hearing on July 20, 2006 and August 25, 2006 to consider confirmation of the Debtors' Chapter 13 Plan and its Motion to Avoid Lien (doc 3), and on judgment creditor Suzanne Mallon's Motion to Dismiss (doc 27). The Chapter 13 Trustee objected to confirmation (doc 11), as did Suzanne Mallon (doc 8) and creditor Homes by Labbate, LLC (doc 9). Suzanne Mallon also objected to the avoidance of her lien (doc 7). Homes by Labbate objected to dismissal (doc 32). By agreement of the parties, all issues were tried simultaneously. After trial, the parties submitted Memoranda of Law (Debtors, doc 42; Chapter 13 Trustee, doc 45; Suzanne Mallon, doc 46; Homes by Labbate, doc 47) to which Debtors replied (docs 48 and 49). The Court has reviewed the testimony and the arguments of the parties, and has consulted relevant authorities, and now issues this Memorandum Opinion, denying confirmation with leave to file an amended plan, denying the motion to dismiss and partially voiding the Mallon lien.[1]

[1] The Court has subject matter and personal jurisdiction pursuant to 28 U.S.C. §§1334 and 157(b); this is a core
(continued...)

**BACKGROUND**

Debtors filed their voluntary Chapter 13 proceeding on October 15, 2005 (doc 1). On the petition they list a prior bankruptcy case that was filed in New Mexico on May 24, 2004, Case number 13-04-13880 SA. The docket sheet in that case, of which the Court takes judicial notice, shows that it was voluntarily dismissed by the Debtors on July 10, 2004.

Schedule A in the current case lists 3 parcels of real estate: Debtors' homestead in Albuquerque with a value of $276,000 and secured claim of $204,361[2]; vacant land in Salton City, California with a value of $1,300 and no secured claim; and a one-half joint tenancy interest (with their son) of a commercial lot on Central Avenue, Albuquerque with their 50% interest having a value of $112,500 and a secured claim of $166,778[3].

---

[1](...continued) proceeding pursuant to 28 U.S.C. §157(b)(2)(A), (K), (L) and (O); and these are findings of fact and conclusions of law as required by Rule 7052 F.R.B.P. This chapter 13 case was filed prior to the effective date of most of the provisions of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), Pub. L. No. 109-08, 119 Stat. 23, and therefore the changes enacted by that legislation are not applicable to this case.

[2]Per Schedule D, this consists of a first mortgage of $179,892 and a second of $24,469.

[3]Per Schedule D, this consists of a first mortgage of $123,728, a second of $1,112, and a mechanics lien of $52,645. These figures add to $177,584, which exceeds the debt listed on Schedule A by $10,707. Also, at trial the attorney for the (continued...)

Schedule B lists ordinary possessions, all of which are exempt, 4 vehicles (1999 Ford, valued at $8,630 with $8,000 exempt, and 3 other non-exempt vehicles valued at a total of $3,843), and a non-exempt 18 foot utility trailer valued at $1,000. Schedule C claims exemptions under New Mexico law. No parties filed objections to the Debtors' exemptions, so those properties are now exempt. See Taylor v. Freeland & Kronz, 503 U.S. 638 (1992). Schedule D lists the debts mentioned in footnotes 2 and 3, and also lists the judgment lien of Suzanne Mallon for $145,289. Debtors have no unsecured priority claims on Schedule E and $120,435 of unsecured debt owed to 18 unsecured creditors on Schedule F. Schedule G lists no executory contracts or unexpired leases. Schedule H lists William Keenan, Jr. (Debtors' son) as a co-debtor to First State Bank (mortgage on Central property), but exhibits and testimony at trial indicated that the loan is in the Debtors' names only. Schedule I states that Mr. Keenan is an accountant with gross income of $5,045

[3](...continued) mechanics lienholder represented that because the lien was over two years old and a foreclosure action had not been initiated, it would become a general unsecured claim if challenged. See N. M. Stat. Ann. § 48-2-10 ("No [mechanics' or materialmen's] lien ... remains valid for a longer period than two years after the claim of lien has been filed unless proceedings have been commenced in a court of competent jurisdiction within that time to enforce the lien.") Therefore, the rest of this Memorandum will treat this claim as unsecured.

monthly and net monthly income of $3,247[4]. Schedule I also states that Ms. Keenan is an administrative assistant at the University of New Mexico with gross income of $2,626 monthly and net monthly income of $1,842[5]. Total combined net monthly income is therefore $5,090. Schedule J shows a home mortgage payment of $2,101 and, for the most part, ordinary expenses. Total expenses listed are $4,056. Excess income over expenses is $1,033.

The Statement of Financial Affairs shows that Debtors' income has remained stable, with some small increases, since 2003. It appears there were no preferential payments to creditors. Suzanne Mallon obtained her "Fraud & Unfair Trade Practices" judgment on September 9, 2005. The only gifts made by the Debtors were nominal contributions to their church. Debtors lost $1,200 gambling in August, 2005 while in Las Vegas, Nevada. Mr. Keenan lists a sole proprietorship business, described as follows: "Debtor bought and sold approximately 10 vehicles over a 3 year period as an individual. No dealer's license required by the State of N.M. because Debtor never sold more than 4 vehicles per year. Debtor did report income on Schedule C of his income tax returns." The business was described as beginning in 1999 and ending in 2002.

---

[4]Among other deductions, Mr. Keenan claims a $505 monthly 401(k) retirement fund contribution.

[5]Among other deductions, Ms. Keenan claims a $200 monthly New Mexico PERA retirement contribution.

Debtors' Chapter 13 Plan ("Plan")(doc 3) calls for 36 monthly payments of $1,033, plus federal and state income tax returns received during that period. The Plan did not call for contribution of the proceeds from the sale of any property, but Debtors amended their Plan orally at the confirmation hearing to provide for contribution of the proceeds of a proposed sale of the Salton City property.

The Plan pays as follows: first, administrative expenses including trustee's fees and expenses; second, any priority claims (of which there are none); no secured claims are paid by the plan, but "[s]ecured creditors shall retain their liens until any allowed secured claims have been paid"; and, third, unsecured creditors will receive an estimated dividend of 14% of their claims. Debtors will pay their first and second mortgage on their residence directly. Debtors' son Michael Keenan Jr. will pay directly all claims secured by the Central Avenue property. The Plan contains a motion to avoid the lien of Suzanne Mallon as a judgment lien impairing Debtors' homestead.

Mallon objected to the lien avoidance[6]. (Doc 7).

---

[6]Mallon objected to avoidance of her lien on 3 grounds: 1) Debtors have not proven that the lien impairs their exemption, 2) the lien is not within the class designated by § 522(f)(1)(B), and 3) Debtors lack standing under Hansen v. Green Tree Servicing, LLC (In re Hansen), 332 B.R. 8 (10th Cir. BAP 2005).

Case 05-21229-s13 Doc 51 Filed 03/27/07 Entered 03/27/07 13:29:05 Page 5 of 40

Mallon also objected to confirmation on the grounds that the Plan was not proposed in good faith[7]. (Doc 8). Homes by Labbate, LLC objected to confirmation of the Plan on the grounds that it does not pay its secured claim and fails to provide that creditors retain their liens and receive the value of the claim. (Doc 9). The Trustee objected to confirmation of the Plan for several reasons: disposable income, best interest of creditors test, and good faith[8]. (Doc 11).

Before the Plan came up for confirmation Mallon also filed a Motion to Dismiss the bankruptcy. (Doc 27). Homes by Labatte, LLC filed an objection to the Motion to Dismiss. (Doc 32).

---

[7]Specifically, Mallon claims: 1) Debtors have abused the protection of bankruptcy in the past, 2) they misrepresented values on Schedule A, 3) they misrepresented personal property on Schedule B, 4) they improperly claimed exemptions on Schedule C, 5) they misrepresented income on Schedule I, 6) they overestimated expenditures on Schedule J, and 7) they misrepresented their income on the Statement of Financial Affairs.

[8]Trustee's specific objections are: 1) Debtors are contributing to retirement plans, 2) any excess home equity should be paid into the Plan, 3) tax refunds should be paid into the Plan, 4) under the best interest of creditors test Debtors must pay at least $30,531 into the plan, 5) Debtors should not make any payments on the Central Avenue property or its taxes, 6) there is an issue of whether Debtors should sell the Central Avenue property and pay the proceeds into the estate, 7) the Trustee questions the values of certain items of personal property, and 8) the Trustee objects that Debtors' son is listed as an unsecured creditor for payments he made on the Central Avenue property on behalf of the Debtors.

Case 05-21229-s13   Doc 51   Filed 03/27/07   Entered 03/27/07 13:29:05 Page 6 of 40

All pending matters came on for trial on July 20, 2006 and
August 25, 2006.

**ANALYSIS**

**The Salton City property**

The Debtors testified that they have owned this property for
approximately 30 years, having received it as a wedding gift.
The area in which the property is located was subdivided in the
1950's or 1960's, but remained mainly undeveloped for many years
because the area is near a highly polluted body of water that
smells bad.  Mr. Smith, Debtors' expert, testified that several
lots in the area had sold for $1,500 or less in the last few
years.  He also placed a value on the property of $8,000.
Debtors had not seen the property for many years.  They had,
however, received offers ranging from $250 to $1,300 in the past
several years.  They listed the property on Schedule A at the
highest offer they had received.

Mallon's expert witness testified that the property is worth
$27,000 because the area has become more desirable as the
population in nearby counties has grown rapidly.

The Court finds the Debtors' testimony credible and finds
that they valued the property on Schedule A in good faith.  The
Court need not make an actual finding on the value of the
property because Debtors have now committed to putting the net
sale proceeds, whatever they are, into the Plan.  Potential

disputes about whether the property is being sold for fair market value or about the identity of the purchaser or any other such issue can be resolved when the Debtors seek approval of a sale.

**<u>Debtor's Sunset Canyon residence</u>**

Debtors purchased their residence on Sunset Canyon in April 1996 for $251,000. Debtors introduced two appraisals into evidence, one showing a value in March, 2005 of $276,000 and one from October, 2005 of $280,000. Debtors also testified that they had an appraisal from approximately one and a half years before filing which showed a value of $242,000. Mallon's appraiser found that the house was worth approximately $378,500 as of July 15, 2006, nine months after the petition was filed. Although the Mallon appraisal casts doubt on the accuracy of the relatively low figure of $280,000, there is no other testimony specifically about the value of the residence on the petition date. However, that does not mean that the Court must accept the $280,000 as the value on the petition date. Rather, an analysis of the appraisals and the testimony supporting them suggests a more accurate estimate of the value as of October 2005 would be $325,000.

To begin with, the Court agrees that comparable sales closer in time to the proposed valuation date are more likely to be helpful than earlier or later sales. In this case, two of the Debtors' Whalen comparable sales (3905 and 3916 Calle Pino NE),

which appear on both the April and October 2005 appraisals (Debtors' Exhibit 5), closed in December 2004 and January 2005, ten and nine months earlier respectively than the filing date. The first comparable sale from the April 2005 appraisal closed in August 2004 (14 months), although it was replaced in the October appraisal with one that closed in May 2005 (five months). The three comparable sales used in the Mallon appraisal (Mallon Exhibit S) use appraisals from June, May and March 2006, eight, seven and five months away respectively.

The Debtors' expert appraiser attributed little additional value to the fact that the lot is approximately 6/10 of an acre, whereas the comparable properties are all 1/4 acre or less. Indeed, the first comparable on the October appraisal is situated on a lot that is .15 of an acre.[9] Similarly, the appraiser appears to have attributed little additional value to the location of the Debtors' home (backing up against United States Forest Service land at the foot of the mountains) and the resulting additional privacy or seclusion, although he acknowledged in his examination that those factors could or would add value.

---

[9] The Mallon appraisers used Fannie Mae Form 2005 (March 2005); the Debtors' appraisers used Fannie Mae Form 1004 (6-93). The Mallon appraisal does not show lot sizes; there appears to be no place for that information on the form.

Also damaging to the credibility of the Debtors' October appraisal is that the Debtors put in approximately $47,000 - $48,000 of improvements in June and July 2004[10], and then, in a rising price market (as testified to by Debtors' expert), ended up with a value of $276,000 and $280,000 for a property they had paid $251,000 for in 1996.[11] Mr. Keenan's testimony was clear that the money had been well spent; the improvements should have been reflected in the value.

Finally, all three appraisals acknowledge that the work done on the house gave it an effective age of about 25 years, even though it was a 39 year old building. Debtors' appraisals effectively treat the building as a 39 year old building by comparing it with buildings in a similar age range; Mallon's

---

[10] Mr. Keenan testified that this amount was spent mostly on deferred maintenance; some was spent on improvements. The work included tree removal, landscaping, wrought iron and fence installation, repairing the roof on the back half of the house, replacing the garage door, installing decking, replacing carpet, drywalling, repainting the entire house, installing new kitchen cabinets, and three weeks' worth of work on one of the bathrooms.

[11] On cross examination Mr. Keenan also testified that in March 2004 a potential lending institution had an appraisal done. The appraiser valued the property at $242,000 because of deferred maintenance. While this figure would appear to support the Debtors' appraisals, the Court is hesitant to accept it as proof of much of anything. Neither the appraiser nor the appraisal were made available to the Court, and the lending institution might have a financial incentive to obtain a "lowball" value; for example, a lower loan to value ratio could trigger a higher interest rate or a special insurance provision that might generate extra fees for the lender.

appraisal on the other hand treats it as a 25 year old building, which is more accurate.[12]

**Central Avenue Property**

The uncontroverted testimony of the Debtors and their son Michael Keenan, Jr. and the exhibits introduced into evidence, establish that the Debtors and their son originally purchased the Central Avenue property as joint tenants. The Debtors and their son testified that they had an agreement that the Debtors and their son each owned a one-half interest in the property. The son then tried to get a construction loan for the construction of a building on the property from which to operate his business. Ms. Cynthia Richards from First State Bank testified that that bank would not make a loan to the son because of his poor credit history, but would make the loan to the Debtors. She also testified that in order for the title company to issue a mortgagee's policy of title insurance, the title company required that the son transfer his interest in the property to the Debtors. All parties testified that they did not realize that the son had signed a deed at closing for his one-half interest until after the bankruptcy was filed.[13] Michael Keenan, Jr. has

---

[12] Despite the foregoing analysis, there is no basis for finding that the Debtors deliberately undervalued the Sunset Canyon property.

[13] While it seems surprising that Michael Keenan, Jr. in particular would not understand that he was signing away the (continued...)

made all the payments on the loan to First State Bank. Furthermore, Michael Keenan, Jr. is in possession and always has been in physical possession of the property – he operates his business from this location.

The Court finds the value of the Central Avenue property to be $225,000. This finding is based on the opinion of the Keenans, as owners, see City of Albuquerque v. Ackerman, 82 N.M. 360, 362, 482 P.2d 63, 65 (1971)(owner of real property is presumed to have special knowledge as to its value by reason of ownership and therefore is competent to testify to value), and the market value estimate of Don Nailer, see Hickey v. Griggs, 106 N.M. 27, 28-29, 738 P.2d 899, 901-02 (1987)(real estate broker could testify as expert witness on property value; formal appraisal is not required.) and N.M. Stat. Ann. § 61-30-10(F)[14].

---

[13](...continued)
property, the reality is that parties not familiar with real estate transactions or legal documentation could easily (and probably frequently do) "just sign where they are told to." Since the Debtors did not sign the deed, it is less surprising that they would not have noticed the transfer at the time.

[14]That section provides:

> The requirement of registration, licensing or certification shall not apply to a real estate broker or salesperson who, in the ordinary course of business, gives an opinion of the price or value of real estate for the purpose of securing a listing, marketing of real property, affecting a sale, lease or exchange, conducting market analyses or rendering specialized services; provided, however, this opinion of the price or value shall not be referred to or construed as an appraisal or appraisal report and no compensation, fee

(continued...)

Although record title to this property is in the Debtors, the Court finds that substance should control over form. The Debtors and their son purchased the property jointly and always intended that the property remain as joint property. New Mexico recognizes the doctrine of resulting trusts.

> A resulting trust differs from an express trust in the manner of its creation. It arises when a person makes a disposition of property under circumstances which raise an inference that such person does not intend that the party taking or holding the property should also have the beneficial interest therein, and where the inference is not rebutted and the beneficial interest is not otherwise disposed of. Restatement § 404; accord Bassett v. Bassett, 110 N.M. 559, 566, 798 P.2d 160, 167 (1990). Since the person who holds title to the property is not entitled to the beneficial interest, the property "springs back or results," to the person who made the original disposition or to that person's estate. Watson Truck & Supply Co. v. Males, 111 N.M. 57, 59, 801 P.2d 639, 641 (1990). In the case of a resulting trust it is not necessary to show that the settlor manifested any intention to create a trust. It is necessary to show the absence of any intention to give the beneficial interest to the transferee. In that case the settlor presumably intends to retain the beneficial interest, or it may be inferred that the settlor would have formed such an intention had the settlor foreseen certain future events. See Restatement Ch. 12, Topic 4, Introductory Note at 392.

Aragon v. Rio Costilla Cooperative Livestock Assn., 112 N.M. 152, 155, 812 P.2d 1300, 1303 (1991). The Court finds that Michael Keenan, Jr. has an equitable interest in the Central Avenue

---

[14](...continued) or other consideration is expected or charged for such opinion, other than the real estate brokerage commission or fee for services rendered in connection with the identified real estate or real property.

property in the form of a resulting or constructive trust. See also Matter of Estate of McKim, 111 N.M. 517, 520, 807 P.2d 215, 218 (1991):

> In Sargent v. Hamblin, 57 N.M. 559, 570, 260 P.2d 919, 926 (1953), we noted that it is the intention of the parties at the time an agreement to execute a deed is consummated that determines whether beneficial title to the property was transferred.
>
> ...
>
> Although the intention of the parties at the time of the transfer is of course the relevant inquiry, we recognized in Sargent that the parties' actions following the transfer are often revealing of their intent at the time of the transfer. In Sargent we outlined a number of factors regarding the parties' later actions which are useful in determining whether the parties intended, at the time of delivery of a deed absolute in form, that beneficial title be conveyed. As we stated:
>
>> The subsequent conduct of the parties is often persuasive of what they intended to accomplish by the transaction. Among the circumstances held to be evidence that they intended to convey title * * * are the following: That the grantor relinquished possession; that he allowed a long period of time to elapse without asserting a claim to the land or exercising any act of ownership over it; that he paid no taxes or encumbrances; that grantee took possession and exercised dominion over the land as owner; that he paid taxes; that he put valuable improvements on the land; that he contracted to sell and convey the land as owner.
>
> Sargent, 57 N.M. at 571, 260 P.2d at 927. Likewise, and most relevant to our inquiry, the absence of these or similar factors would tend to show that the parties did not intend to convey beneficial title, but rather to pass conditional ownership or “dry” legal title, leaving beneficial ownership in the hands of the grantor.

Debtors’ son conveyed the property (unknowingly), but never relinquished possession. He paid the taxes and encumbrances. He placed a valuable building on it. Debtors never took possession

or exercised dominion over it, never paid taxes, never put improvements on it, and never represented that they owned it outright. Considering the McKim factors, it was obvious that Debtors' son never intended to convey beneficial ownership of the property. See also McCord v. Ashbaugh, 67 N.M. 61, 65, 352 P.2d 641, 644 (1960)("A resulting trust arises when the legal estate in property is disposed of, conveyed, or transferred, but the intent appears or is inferred from the terms of the disposition or from accompanying facts and circumstances that the beneficial interest is not to go, or to be enjoyed, with the legal title.") (Citations omitted.)

The Court further finds that this trust or lien is not avoidable in the bankruptcy. See Section 541(d)[15] and Crowder v. Crowder (In re Crowder), 225 B.R. 794, 797 (Bankr. D. N.M. 1998):

> The statutory protection afforded bona fide purchasers works in conjunction with common law principles of equity or constructive notice. Constructive notice is firmly embedded in New Mexico common law. Under constructive notice principles, once a duty of inquiry

---

[15]That section provides:

> Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest, such as a mortgage secured by real property, or an interest in such a mortgage, sold by the debtor but as to which the debtor retains legal title to service or supervise the servicing of such mortgage or interest, becomes property of the estate under subsection (a)(1) or (2) of this section only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.

> arises, subsequent purchasers are held to have notice of all documents a reasonable inquiry would uncover, even if those documents are not recorded. A party in possession of the property who is not the record title holder of the property gives rise to a duty of inquiry on the part of a subsequent purchaser, mortgagee, or lienholder.

(Holding that Section 544(3) cannot be used to avoid an interest of one in actual possession of a property.) (Citations omitted.) Therefore, Debtors' interest in the whole property, $225,000, would be reduced by the first mortgage of $123,728 and the second mortgage of $1,112, leaving an equity of $100,160, of which one-half, or $50,080 is non-exempt estate property.

The Mallon lien attached to the one-half interest in the property[16]. Armendaris Water Development Co. v. Rainwater, 109 N.M. 71, 75, 781 P.2d 799, 803 (Ct. App. 1989)(Liens only attach to a debtor's beneficial interest in a property). See also McCord, 67 N.M. at 66, 352 P.2d at 644 (Judgment liens do not attach to property for which debtor has bare legal title.)

Alternatively, the Court finds that the Central Avenue property is owned by a partnership consisting of the Debtors and their son. Under New Mexico law, a partnership is defined as "an association of two or more persons to carry on as co-owners a business for profit ..." N.M. Stat. Ann. § 54-1A-101(5). "[T]he association of two or more person to carry on as co-owners a

[16]The Court discusses below whether the lien is avoidable by the Trustee as a preference.

business for profit forms a partnership, whether or not the persons intend to form a partnership." N.M. Stat. Ann. § 54-1A-202(a). A partner's interest in partnership property is the partner's share of the profits and losses of the partnership and the partner's right to receive distributions. N.M. Stat. Ann. § 54-1A-502. This interest is personal property. Id. Assets of a partnership can be held in the name of one or more partners individually. N.M. Stat. Ann. § 54-1A-204(c). When a partner files bankruptcy, only the partner's partnership interest (i.e., the personal property right to share in profits and losses and the right to receive distributions) enters the bankruptcy estate. Connolly v. Nuthatch Hill Assoc. (In re Manning), 831 F.2d 205, 207 (10th Cir. 1987). The partnership assets themselves do not enter the bankruptcy estate. Id. Therefore, in this case, if the agreement is construed as a partnership venture, the only asset in the Debtors' estate is their personal property interest in the partnership. If the partnership were dissolved, the property would be sold for $225,000, the mortgages of $123,728 and $1,112 would be paid, and the remaining equity of $100,160 would go to the partners. N.M. Stat. Ann. § 54-1A-807(a). The value of the Debtors' one-half partnership interest would be $50,080 and non-exempt.[17]

---

[17] In reaching its conclusion that the Court has not relied on the proof of claim filed by Michael Keenan, Jr.

If the property were partnership property, Mallon's judicial lien would not attach to it. N.M. Stat. Ann. § 54-1A-201 (Partnership is a distinct entity), §54-1A-203 (Property acquired by partnership is partnership property, not property of individual partners.), § 54-1A-501 (A partner is not a co-owner of partnership property and has no interest in partnership property that can be involuntarily transferred.)

Finally, the Court finds that the Debtors' treatment of the Central Avenue property on their Schedule A was done in good faith. There was no indication that they were attempting to undervalue the property or conceal it; based on the unique facts of this case it required a judicial determination to value the property.

**Other findings**

The Court found the testimony of Mr. and Ms. Keenan credible. The Court also found the testimony of their son credible.

Mallon filed her transcript of judgment on September 23, 2005. (Exhibit D.) For the purposes of this confirmation hearing only, the Court also finds that the judgment evidences an antecedent debt (the jury trial was on April 7, 2005); that the filing of the transcript of judgment was a "transfer" of the debtors' property (see 11 U.S.C. § 101(54) (defining transfer)); the transfer was to or for the benefit of Mallon; the transfer

was made within 90 days of the Debtors' bankruptcy filing; and the transfer enabled Mallon to receive more than she would receive if the case were a case under chapter 7, the transfer had not been made, and she received payment of her debt to the extent provided by the bankruptcy code. In other words, the Court finds (for the purposes of confirmation only) that Mallon's transcript of judgment is a preferential transfer. See 11 U.S.C. § 547(b).

The Debtors are not serial bankruptcy filers and have not abused the bankruptcy process. Debtors both testified as to their prior bankruptcy and the reasons for dismissing it; i.e., they were finally able to sell their California property and wished to deal with creditors outside of bankruptcy. They also testified as to why they refiled the case; i.e., mounting credit card debt and the Mallon litigation. It is not per se improper to file two bankruptcies. See, e.g., In re McKissie, 103 B.R. 189, 191 (Bankr. N.D. Ill. 1989). This is especially true when there has been a change in circumstances from the first case to the second. Compare, id. at 192 (bad faith if no change in circumstances.) In this case, Debtors tried to work out their financial problems with creditors and paid significant amounts of money to them between the two bankruptcy cases. The Court finds that this second filing was not improper. The Court also finds it not improper that the Debtors used a large portion of the money from the sale of another California property (the Twin

Peaks property) to perform deferred maintenance and some improvements on their home.[18]

The Court finds that the Debtors did not misrepresent their real property assets or personal property assets on Schedules A and B. The real property was discussed in detail above; the Court found no intentional misrepresentations. Neither Mallon or the Trustee produced any evidence that any personal property asset was omitted from Schedule B or had its value misrepresented.

The Court has independently reviewed the exemptions claimed on Schedule C and finds that they are all permissible under New Mexico law. Neither Mallon or the Trustee produced any evidence that Debtors misrepresented income on their Schedule I. They attempted to elucidate evidence from Mr. Keenan that he failed to report income from sales of cars or from salary for working at his son's business, but were unable to do so[19]. In fact, the uncontroverted testimony was that Mr. Keenan had no income from auto sales since 2002 and had never earned a salary from his son's business. The Court has also independently reviewed the expenses listed on Schedule J and, except for Mr. Keenan's

---

[18] Arguably the money spent increased the value of the home thereby increasing the equity available to satisfy claims.

[19]One check, for $3,500, passed through Mr. Keenan to his son. This was not income to Mr. Keenan. This was adequately explained at trial.

retirement deduction, finds them all reasonable and credible. There was no evidence presented that the Debtors misrepresented their historical income on the Statement of Financial Affairs.

Regarding several specific Trustee objections to confirmation, the Court finds 1) there is no excess home equity to contribute to the Plan because Mallon's lien can only be avoided to the extent that it impairs the Debtors' exemption; to the extent it does not impair the exemption it remains attached, leaving no excess equity; 2) the Plan already calls for contributions of tax returns into the Plan, see Plan ¶B(1)(a) (doc 3); Debtors' Plan does not call for Debtors to make any payments or to pay taxes on the Central Avenue property; 3) Debtors need not sell their interest in the Central Avenue property because their Plan payments will more than cover the non-exempt equity in this property and to confirm, the Debtors must meet the best interest of creditors test (see discussion below); 4) the Trustee questioned the value of certain personal property items but offered no evidence to contradict the schedules; and 5) the Trustee objected to the Debtors' son being listed as an unsecured creditor – either he is or he is not, and the proper method of challenging his claim, at least in this case, would be through a claims objection, not the confirmation process.

**Confirmation**

Confirmation of a Chapter 13 plan is governed by Section 1325[20]. Subsection (a) mandates plan confirmation if six

---

[20]Section 1325 provides, in part:
(a) Except as provided in subsection (b), the court shall confirm a plan if--
(1) the plan complies with the provisions of this chapter and with the other applicable provisions of this title;
(2) any fee, charge, or amount required under chapter 123 of title 28, or by the plan, to be paid before confirmation, has been paid;
(3) the plan has been proposed in good faith and not by any means forbidden by law;
(4) the value, as of the effective date of the plan, of property to be distributed under the plan on account of each allowed unsecured claim is not less than the amount that would be paid on such claim if the estate of the debtor were liquidated under chapter 7 of this title on such date;
(5) with respect to each allowed secured claim provided for by the plan--
(A) the holder of such claim has accepted the plan;
(B)(I) the plan provides that the holder of such claim retain the lien securing such claim; and
(ii) the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim; or
(C) the debtor surrenders the property securing such claim to such holder; and
(6) the debtor will be able to make all payments under the plan and to comply with the plan.

(b)(1) If the trustee or the holder of an allowed unsecured claim objects to the confirmation of the plan, then the court may not approve the plan unless, as of the effective date of the plan--
(A) the value of the property to be distributed under the plan on account of such claim is not less than the amount of such claim; or
(B) the plan provides that all of the debtor's projected disposable income to be received in the three-year period beginning on the date that the
(continued...)

specified requirements are met. Petro v. Mishler (In re Petro), 276 F.3d 375, 378 (7th Cir. 2002). Subsection (b) comes into play when a trustee or holder of an allowed unsecured claim objects to confirmation. At issue in this case are disposable income (§ 1325(b)), the best interest of creditors test (§ 1325(a)(4)), feasibility (§ 1325(a)(6)), and good faith (§ 1325(a)(3)).

A. Disposable income

Both the Trustee and Mallon objected to confirmation, triggering the disposable income requirements of § 1325(b). The Plan does not propose to pay 100% of the claims. See § 1325(b)(1)(A). Therefore the Court cannot confirm unless the Plan provides that all of the Debtors' projected disposable income to be received in the three-year period beginning on the

---

[20](...continued)

> first payment is due under the plan will be applied to make payments under the plan.

(2) For purposes of this subsection, "disposable income" means income which is received by the debtor and which is not reasonably necessary to be expended--

> (A) for the maintenance or support of the debtor or a dependent of the debtor, including charitable contributions (that meet the definition of "charitable contribution" under section 548(d)(3)) to a qualified religious or charitable entity or organization (as that term is defined in section 548(d)(4)) in an amount not to exceed 15 percent of the gross income of the debtor for the year in which the contributions are made; and
>
> (B) if the debtor is engaged in business, for the payment of expenditures necessary for the continuation, preservation, and operation of such business.

date of the first plan payment will be applied to make payments under the Plan. § 1325(b)(1)(B). The Court has reviewed the Debtors' budget and finds it reasonable with one exception.

> Authority is split on whether voluntary retirement plan contributions represent disposable income. One school of thought, led by the Third Circuit, appears to adopt a per se rule that voluntary retirement plan contributions are never reasonably necessary expenses in a Chapter 13 proceeding. Another school of thought, led by the Second Circuit, appears to allow the confirmation of Chapter 13 plans where debtors continue voluntary contributions to retirement plans or has adopted "case-by-case" analysis granting deference to bankruptcy judges to determine from the facts of each individual case whether pension contributions qualify as reasonably necessary expenses.

In re King, 308 B.R. 522, 530 (Bankr. D. Kan. 2004)(footnotes collecting cases omitted). The Tenth Circuit has not ruled on this issue. However, in ruling on the issue of substantial abuse in the Section 707(b) context, the Tenth Circuit adopted a "totality of the circumstances" standard. Stewart v. United States Trustee (In re Stewart), 175 F.3d 796, 809 (10th Cir. 1999). This Court believes that the Tenth Circuit would also apply a flexible standard on a case by case basis to determine whether pension fund contributions were reasonably necessary for a debtor's support. Factors that other courts have considered using this approach include 1) the age of the debtor and the amount of time until expected retirement, 2) the amount of the monthly contributions and the total amount of pension contributions, 3) the likelihood that buying back the pension

after the bankruptcy would jeopardize the debtor’s fresh start, 4) the number and nature of debtor’s dependents, 5) evidence that the debtor would suffer adverse employment conditions if the contributions are ceased, 6) the debtor’s yearly income, 7) the debtor’s overall budget, 8) who is challenging the pension payments, or 9) any other constraints on the debtor that make it likely that the pension contributions are reasonably necessary expenses for the debtor. King, 308 B.R. at 531 n.18, citing New York City Employee’s Retirement System v. Sapir (In re Taylor), 243 F.3d 124, 129-30 (2nd Cir. 2001).

Ms. Keenan’s contributions are fixed by state law and required as a condition of employment. See N.M. Stat. Ann. §§ 22-11-16, 21. See also New Mexico Education Retirement Board, Member Handbook, p. 1 (available at http://www.nmerb.org/handbook.htm (Last visited March 5, 2007).) Ms. Keenan’s job is necessary to support the Debtors and repay the creditors, so her continued employment, including paying into her retirement account, meets the King test.

On the other hand, the Court finds that the amounts being contributed to Mr. Keenan’s pension plan are not “reasonably necessary to be expended for the maintenance or support of the debtors.” See 11 U.S.C. § 1325(b)(2)(A). The major factors that the Court considered are: 1) Debtors currently have over $72,000 in retirement funds and insurance products, 2) the proposed $505

contribution to the 401(k) plan is almost one-half the proposed plan payment, 3) the plan is for the minimum 36 month term, 4) the Debtors' middle-age status, and 5) a total lack of other evidence of why the pension plan should be continued.

Therefore, the Court cannot confirm this Plan unless the Debtors amend the plan payment to be $1,033 plus $504, $1537, retroactive to the date the first payment was due. This creates a plan base of $55,332 over the 36 month term of the Plan. How the Debtors do this should be their choice; they can choose to pay a lump sum for back payments, increase future payments, or lengthen the term of the plan. The Court would also entertain an amendment that allowed some payment to the 401(k) plan currently, provided that the total amount paid into the plan satisfies the other requirements for confirmation. See In re Rigg, 13-04-11927 SA, oral ruling October 6, 2004 (Minutes, doc. 23)(Court allowed reduced retirement funding if debtors made up difference.)

B. Best interest of creditors test

Section 1325(a)(4), referred to as the "best interest of creditors test" assures that creditors will be paid, at a minimum, the amount which they would be paid if the case were a hypothetical chapter 7 liquidation case.

> Chapter 13 is advantageous to debtors because they retain all their assets, including non-exempt assets, and make payments to creditors over a period of time during which debtors enjoy the protection afforded by bankruptcy law. This benefit to debtors is carefully balanced by the best interest of creditors' test of §

> 1325(a)(4). Under this statutory quid pro quo the debtor keeps his or her assets and creditors are assured of receiving what they would be paid in a Chapter 7 liquidation.
>
> In order to determine compliance with the best interest of creditors test:
>
>> a hypothetical liquidation of the debtor's estate under Chapter 7 on the "effective date of the plan" must be compared to the value on "the effective date of the plan" of what the debtor proposes to distribute to the holders of allowed unsecured claims. A mathematical calculation must be made of the value of what would be available for distribution to unsecured claim holders in a Chapter 7 case. The debtor's proposed distributions to unsecured claim holders must be "present valued" (discounted) as of the effective date of the Chapter 13 plan.
>
> Keith M. Lundin, Chapter 13 Bankruptcy § 5.25 (1990).

In re Coonrod, 135 B.R. 375, 377 (Bankr. D. Neb. 1991). See also Jensen v. Dunivent (In re Dewey), 237 B.R. 783, 788 (10th Cir. BAP 1999):

> Section 1325(a)(4) requires two separate calculations. First, the court must consider the value, as of the effective date of the proposed Chapter 13 plan, of the property to be distributed to each unsecured creditor in Chapter 13, taking into account the Chapter 13 administrative expenses. Next, the court must consider the amount that would be paid on each allowed unsecured claim if the debtor's estate were liquidated in a hypothetical Chapter 7 case, taking into account the Chapter 7 administrative expenses. See In re Gatton, 197 B.R. 331, 332 (Bankr. D. Colo. 1996); In re Ward, 129 B.R. 664, 670 (Bankr. W.D. Okla. 1991); In re Barth, 83 B.R. 204 (Bankr. D. Conn. 1988). The Chapter 13 plan will meet the best interests of creditors test if the distribution amount determined in the first, Chapter 13, calculation is not less than the amount in the second, Chapter 7, calculation.

One issue that has raised considerable controversy is the meaning of the phrase "effective date of the plan", a term

undefined by the Code. Forbes v. Forbes (In re Forbes), 215 B.R. 183, 189 (8th Cir. BAP 1997). Compare Keith M. Lundin, Chapter 13 Bankruptcy, 3d Ed. § 160.1 (2000 & Supp. 2004)(hereafter Lundin)("Without directly deciding the question, most best-interests-of-creditors test cases perform the hypothetical liquidation as of the date of the Chapter 13 petition.") with, e.g., Education Assistance Corp. V. Zellner (In re Zellner), 827 F.2d 1222, 1225 (8th Cir. 1987)("Of course, the effective date of the plan cannot be antecedent to the confirmation hearing at which the issues raised by section 1325(a)(4) are to be heard by the court.")(Citation omitted.); In re Musil, 99 B.R. 448, 451 (Bankr. D. Kan. 1988)("[T]he effective date can be no earlier than the date the first confirmable plan is heard.") The Court has reviewed numerous cases, Colliers and Lundin and finds that the most natural meaning of the "effective date of the plan" is the date of confirmation. In this instance, however, the parties have implicitly litigated these issues as if the effective date were the petition date. Since the parties have in effect agreed on that definition, the Court has also used that definition in arriving at its ruling.

The Court makes the following calculations:

| Asset | Value | Exemption & unavoidable liens | Available for Chapter 7 trustee |
|---|---|---|---|
| Homestead | $325,000 | $264,361 | $60,639[21] |
| Salton City | unknown | $0 | unknown |
| Central Avenue property | $50,080 | $0 | $50,080[22] |
| Cash & checking | $247 | $247 | $0 |
| Personal effects | $7,700 | $7,700 | $0 |
| Retirement & insurance | $71,900 | $71,900 | $0 |
| Vehicles | $13,473 | $8,000 | $5,473 |
| Total available for Chapter 7 Trustee | | | 116,192 plus Salton value |
| Less: | | | |
| Estimated closing costs on residence at 9% | | $29,250 | |
| Capital gains taxes[23] | | $6,713 | |

[21]The chapter 7 trustee would avoid Mallon's transcript of judgment as a preferential transfer and preserve the lien for the benefit of the estate under Section 551. As discussed below, Debtors would still be entitled to avoid this lien to the extent it impairs their homestead exemption.

[22]The chapter 7 trustee would avoid Homes by Labatte's unperfected lien under section 544 and Mallon's transcript of judgment and preserve the liens for the benefit of the estate under Section 551. Alternatively, if the land is partnership property the partnership interest is not exempt. Debtors may wish to provide expert testimony in any future hearing on whether a discount should be applied to this value either because it is jointly held property or a closely-held partnership interest.

| | | |
|---|---|---|
| Statutory trustee fees[24] | $9,060 | |
| Estimated trustee attorney fees and costs | $1,000 | |
| Estimated trustee accountant fees and costs | $1,000 | |
| Total deductions | | $47,023 |
| Amount available for distribution to creditors in a hypothetical chapter 7 liquidation | | $69,169 plus Salton value |

In the Court's experience, in this jurisdiction it takes approximately two years for a Chapter 7 trustee to liquidate assets, file tax returns, and be ready to close a case. Therefore, the $69,169 should be discounted back to a present value. Applying a 4% rate for inflation, the present value of this $69,169 would be $63,951.[25] Therefore, the Court cannot confirm a plan that calls for net payments to unsecured creditors (after trustee fees) of less than a present value of $63,951 plus

[23]Calculated on the residence as follows: Selling price $325,000 less closing costs of $29,250 gives a net sales price of $295,750; the house cost $251,000; profit is $44,750. Capital gains tax, at 15%, see Internal Revenue Service Publication 17, Your Federal Income Tax, p. 106, Table 16-1 (2006)(available at www.irs.gov), is $6,713. It appears to the Court that there would not be a gain on the sale of the Central Avenue property, so no capital gains taxes would be due on the property. And, any taxes from sale of the Salton City property would taken into account in the net amount to be received from the sale.

[24]Section 326 limits chapter 7 trustee fees to 25% of the first $5,000; 10% of amounts from $5,000 to $50,000; and 5% of amounts in excess of $50,000. There are further reductions at higher levels, but they are not relevant to this case.

[25]See http://www.timevalue.com/tools.aspx (Follow "What is my future value worth today?" hyperlink)(Last visited March 26, 2007).

the net[26] value of the Salton City property. Confirmation will be denied with leave to amend the plan.

C. Feasibility

Because the Court has denied confirmation of this Plan, technically it need not address the Plan's feasibility. Nevertheless, because the Court has suggested what amendments will result in a confirmable plan, the Court will make such a finding. The Debtors schedules show a budget surplus of $1,537. The best interests of creditors test requires Debtors to pay a present valued sum of $63,951 (together with the net proceeds of the Salton City property). Together with Trustee fees, the amount paid under the plan must have a present value of $71,057[27]. At $1,537 per month, it will take the Debtors 51 months to pay the $71,057.[28] Nothing in the record suggests the Debtors cannot make those payments. Debtors also have some exempt assets they could apply to the Plan.

D. Good Faith

The Court has denied confirmation of this Plan, but Debtors have leave to file an amended plan. The issue of good faith will

---

[26]Capital gains taxes shall be considered a cost of sale of the Salton City property and the Chapter 13 Trustee shall pay them as an administrative expense of the estate.

[27]$63,951 ÷ .9 = $71,057.

[28]See http://www.timevalue.com/tools.aspx (Follow "How long will it take to pay off my loan?" hyperlink).

undoubtedly be an issue with an amended plan, so the Court will rule on the good faith of this plan to aid the parties in negotiating or litigating the amended plan.

> As a general matter, a determination of good faith must be made on a case by case basis, looking at the totality of the circumstances. See Pioneer Bank v. Rasmussen (In re Rasmussen), 888 F.2d 703, 704 (10th Cir. 1989). "In evaluating whether a debtor has filed in good faith, courts should be guided by the eleven factors set forth in Flygare v. Boulden, 709 F.2d 1344, 1347-48 (10th Cir.1983), as well as any other relevant circumstances." Robinson v. Tenantry (In re Robinson), 987 F.2d 665, 668 (10th Cir. 1993) (footnote omitted). The eleven Flygare factors are:
>
> > (1) the amount of proposed payments and the amount of the debtor's surplus; (2) the debtor's employment history, ability to earn and likelihood of future increases in income; (3) the probable or expected duration of the plan; (4) the accuracy of the plan's statements of the debts, expenses and percentage repayment of unsecured debt and whether any inaccuracies are an attempt to mislead the court; (5) the extent of preferential treatment between classes of creditors; (6) the extent to which secured claims are modified; (7) the type of debt sought to be discharged and whether any such debt is non-dischargeable in Chapter 7; (8) the existence of special circumstances such as inordinate medical expenses; (9) the frequency with which the debtor has sought relief under the Bankruptcy Reform Act; (10) the motivation and sincerity of the debtor in seeking Chapter 13 relief; and (11) the burden which the plan's administration would place upon the trustee.
>
> Flygare, 709 F.2d at 1347-48 (quoting In re Estus, 695 F.2d 311, 317 (8th Cir. 1982)). But "the weight given each factor will necessarily vary with the facts and circumstances of each case." Id. at 1348.

Mason v. Young (In re Young), 237 F.3d 1168, 1174-75 (10th Cir. 2001). And, "a Chapter 13 plan may be confirmed despite even the

most egregious pre-filing conduct where other factors suggest that the plan nevertheless represents a good faith effort by the debtor to satisfy his creditors' claims." Id. at 1177 (quoting Neufeld v. Freeman, 794 F.2d 149, 153 (4th Cir. 1986)).

The Court will now analyze each factor:

1) To be confirmable, the Court has ruled that Debtors must adjust their plan payment to $1,537. This is exactly the amount of the Debtors' surplus.

2) The Debtors have had a stable employment history. No evidence was presented one way or the other regarding future increases in income, but it seems likely that they will receive at least cost of living raises. The Plan does not contemplate increases in Plan payments, however, so this factor is not that important.

3) The Plan duration is a minimum of three years, which is one form of the disposable income/best efforts test specified by § 1325(b)(1)(B). In these circumstances this does not indicate either good faith or bad faith. However, it is likely that to propose a confirmable plan, debtors will need to extend the length of the plan to meet the best interests of creditors test.

4) The Plan's statements were accurate; there was no attempt to mislead the Court.

5) There is no preferential treatment of any class of creditors except as authorized by the Code (e.g., attorney fees).

6) Secured claims are not modified. In fact, the Plan has no provision for payment of secured claims. Debtors may wish to amend their plan to pay the portion of the judicial lien on their homestead that they are unable to avoid (see below).

7) The unsecured debt is mostly consumer debt owed to 18 different creditors. Mallon has a judgment which the parties stipulated (for the purposes of confirmation only) would be a nondischargeable debt in Chapter 7. This debt represents about half the total debt. Since chapter 13 was written to permit the discharge of otherwise nondischargeable debt, it is not bad faith per se to use the Bankruptcy Code to do so. In re Schaitz, 913 F.2d 452, 454 (7th Cir. 1990); In re Wilcox, 251 B.R. 59, 67 (Bankr. E.D. Ark. 2000). Overall, the Court does not consider this to be a major factor in this case.

8) There are no exigent circumstances.

9) Debtors have filed one other bankruptcy. This was discussed above, and the Court does not find that it indicates bad faith.

10) The Court finds that the Debtors’ motivation in filing this case was to deal with Mallon’s collection efforts, but also

to deal with all of their debts. Since this also is the purpose of filing a bankruptcy petition, it cannot be said to be bad faith.

11) There would be no burden on the Trustee to administer this case beyond the resources required to administer any other case.

In sum, the Court finds that overall the Plan was proposed in good faith.

**Dismissal**

Dismissal of a Chapter 13 case is governed by Section 1307[29]. Mallon's Motion to Dismiss asserts the following

---

[29]Section 1307 provides, in part:
(c) Except as provided in subsection (e) of this section, on request of a party in interest or the United States trustee and after notice and a hearing, the court may convert a case under this chapter to a case under chapter 7 of this title, or may dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause, including--
(1) unreasonable delay by the debtor that is prejudicial to creditors;
(2) nonpayment of any fees and charges required under chapter 123 of title 28;
(3) failure to file a plan timely under section 1321 of this title;
(4) failure to commence making timely payments under section 1326 of this title;
(5) denial of confirmation of a plan under section 1325 of this title and denial of a request made for additional time for filing another plan or a modification of a plan;
(6) material default by the debtor with respect to a term of a confirmed plan;
(7) revocation of the order of confirmation under
(continued...)

grounds: bad faith, intentional misstatement of the value of the Salton City property on Schedule A, the Debtors' failure to include the full value of the Central Avenue property on Schedule A because it was determined that title to the property rests only in the Debtors, the Debtors' intentional misstatement of the value of their residence, Mr. Keenan's failure to list income he receives from his son for working at his son's auto dealership, and the Debtors' use of proceeds they received from the sale of a California property between the first bankruptcy and the current one. None of these allegations support the statutory requirements for dismissal. They are relevant to the good faith inquiry that the Court conducted above. Consequently, the case will not be dismissed.

**Lien Avoidance**

---

[29](...continued)
section 1330 of this title, and denial of confirmation of a modified plan under section 1329 of this title;[or]
(8) termination of a confirmed plan by reason of the occurrence of a condition specified in the plan other than completion of payments under the plan[.]

Lien avoidance is governed by Section 522(f)[30]. The Court finds that Debtors can avoid the judicial lien of Suzanne Mallon and that her objections are not well taken. Mallon objected to avoidance of her lien on 3 grounds: 1) Debtors have not proven that the lien impairs their exemption, 2) the lien is not within the class designated by § 522(f)(1)(B), and 3) Debtors lack standing under Hansen v. Green Tree Servicing, LLC (In re Hansen), 332 B.R. 8 (10th Cir. BAP 2005). (Doc 7).

---

[30]Section 522(f) provides, in relevant part:
(f)(1) ... the debtor may avoid the fixing of a lien on an interest of the debtor in property to the extent that such lien impairs an exemption to which the debtor would have been entitled under subsection (b) of this section, if such lien is--
(A) a judicial lien...; or
(B) a nonpossessory, nonpurchase-money security interest in any--
(I) household furnishings, household goods, wearing apparel, appliances, books, animals, crops, musical instruments, or jewelry that are held primarily for the personal, family, or household use of the debtor or a dependent of the debtor;
(ii) implements, professional books, or tools, of the trade of the debtor or the trade of a dependent of the debtor; or
(iii) professionally prescribed health aids for the debtor or a dependent of the debtor.
(2)(A) For the purposes of this subsection, a lien shall be considered to impair an exemption to the extent that the sum of--
(I) the lien;
(ii) all other liens on the property; and
(iii) the amount of the exemption that the debtor could claim if there were no liens on the property;
exceeds the value that the debtor's interest in the property would have in the absence of any liens.

First, the Court found that the Debtors' residence was worth $325,000. The two consensual mortgages on the residence total $204,361. Debtors claimed, and are entitled to, a New Mexico homestead exemption of $60,000. N.M. Stat. Ann. 42-10-9. Under the formula set out in Section 522(f)(2) the judicial lien is deemed to impair the exemption in the following amount:

| | |
|---|---:|
| Mallon lien | $145,289.00 |
| Consensual mortgages | $204,361.00 |
| Homestead | $60,000.00 |
| Subtotal | $409,650.00 |
| Value of property[31] | $325,000.00 |
| Amount of impairment | $84,650.00 |

Second, Debtors are not avoiding the lien under Section 522(f)(1)(B); they seek to avoid it under Section 522(f)(1)(A) as a judicial lien[32].

Third, In re Hansen does not prevent the Debtors from avoiding this lien under Section 522(f). The rule of Hansen is that Chapter 13 debtors may not use a trustee's strong arm powers under § 544 to avoid improperly perfected liens. Hansen, 332

[31]Unlike the calculations for the best interests of creditors test, closing costs and transaction fees are not deducted when computing Section 522(f) impairment. Sheth v. Affiliated Realty & Management Co. (In re Sheth), 225 B.R. 913, 918-19 (Bankr. N.D. Ill. 1998).

[32]Section 101(36) provides: "'judicial lien' means lien obtained by judgment, levy, sequestration, or other legal or equitable process of proceeding.

Case 05-21229-s13 Doc 51 Filed 03/27/07 Entered 03/27/07 13:29:05 Page 38 of 40

B.R. at 12-13. In fact, Hansen acknowledges Section 522 as one of the Bankruptcy Code's limited provisions that allow debtors to bring avoidance actions. Id. at 13.

Therefore, Debtors can partially avoid the judicial lien.

For the purposes of this Memorandum, the Court has also assumed that the judicial lien is a preferential transfer. In general, Chapter 13 debtors lack standing to pursue preferential transfer actions. See Wood v. Mize (In re Wood), 301 B.R. 558, 561, 562 (Bankr. W.D. Mo. 2003). Therefore, the Trustee should consider whether she has a duty to pursue a preferential transfer in this case to allow maximum relief to unsecured creditors. See id. at 562.[33]

**CONCLUSION**

The Court will enter an Order in accordance with this Memorandum Opinion. Confirmation will be denied on the basis of the best interest of creditors test. Leave will be granted to amend the Plan.[34]

---

[33] The effect on the Debtors and the unsecured creditors would be considerable. If Mallon's lien is avoided only in part pursuant to § 522(f), Mallon will continue to have a lien on the property for $60,639, but the unsecured creditors (other than Mallon) would receive less. On the other hand, if the Trustee entirely voids the lien pursuant to § 547(b), the Debtors will own their home free and clear of Mallon's lien, and the unsecured creditors other than Mallon will receive a larger dividend.

[34] The Debtors may effectively amend their plan by means of a confirmation order that reflects the conclusions of this memorandum opinion. The form of any such confirmation order must

(continued...)

Honorable James S. Starzynski
United States Bankruptcy Judge

copies to:

James A Askew
PO Box 1888
Albuquerque, NM 87103-1888

Christopher L Trammell
3900 Juan Tabo NE
Albuquerque, NM 87111-3984

David N Hernandez
2221 Rio Grande Blvd. NW, #100
Albuquerque, NM 87104

Rob Treinen
Ste 2000 E
300 Central Ave SW
Albuquerque, NM 87102

Kelley L Skehen
625 Silver Avenue SW
Albuquerque, NM 87102-3111

United States Trustee
PO Box 608
Albuquerque, NM 87103-0608

---

[34](...continued)
of course be approved by opposing counsel.